# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SAMUEL JOHN DAVIDSON,

    Plaintiff,

  v.                                      Case No. 20-CV-577

KILOLO KIJAKAZI,[1]
**Acting Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

Samuel John Davidson seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Davidson initially alleged disability beginning on October 10, 1988, when he was just four years old (DOB Oct. 20, 1983). (Tr. 13, 27.) Davidson previously received disability benefits (Tr. 323); however, the benefits ceased when he was incarcerated from 2007 until 2017 for armed robbery (Tr. 47–48, 325). Davidson amended his alleged onset date to July 6, 2017—the day he was released from prison. (Tr. 13.) He alleges disability due to a learning disability, depression, and mental health issues. (Tr. 197.) Davidson's application was denied

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's recent appointment as acting commissioner.

initially and upon reconsideration. (Tr. 13.) Davidson filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on June 13, 2019. (Tr. 35–60.) Davidson testified at the hearing, as did Deborah Christiansen, a vocational expert. (Tr. 35.)

In a written decision issued November 5, 2019, the ALJ found that Davidson had the severe impairments of schizoaffective disorder, intellectual disorder, major depressive disorder, social phobia, antisocial personality disorder, and an anxiety disorder. (Tr. 15.) The ALJ found that Davidson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 16–19.) The ALJ further found that Davidson had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: can perform simple, routine, and repetitive tasks; can maintain attention and concentration for two-hour segments; can make simple work-related decisions; can tolerate occasional changes in a routine work setting; and can occasionally interact with supervisors and co-workers and never interact with the public. (Tr. 20.)

While Davidson had no past relevant work, the ALJ found that given his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Davidson could perform. (Tr. 27.) As such, the ALJ found that Davidson was not disabled from July 6, 2017 through the date of the decision. (Tr. 28.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Davidson's request for review. (Tr. 1–5.)

# DISCUSSION

1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

2. *Application to This Case*

Davidson argues that the ALJ erred by: (1) finding his statements of disabling symptoms inconsistent with the record evidence; (2) failing to account for his variable

3

functioning in the RFC; and (3) improperly weighing the opinions of his treating medical sources. I will address each in turn.

### 2.1 Evaluation of Subjective Symptoms

Davidson argues the ALJ improperly evaluated his subjective symptoms, erroneously finding that Davidson's course of treatment was "generally conservative," that he benefitted greatly from his medications, and that he generally had good objective findings on mental status examination. He further argues the ALJ put too much weight on his lack of "lengthy" hospitalizations and on his activities of daily living in finding his symptoms less severe than alleged.

The Commissioner's regulations set forth a two-step test for evaluating a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

In discounting Davidson's allegations of disabling symptoms, the ALJ found that Davidson maintained significant mental functional capacity through a generally conservative course of treatment consisting of counseling and medication and that his treatments have "controlled, reduced or eliminated his symptoms." (Tr. 22.) The ALJ further found that Davidson's records showed generally good objective findings on mental status examination and found that Davidson did not require "any . . . significant mental health treatment requiring lengthy in-patient hospitalization." (Tr. 21–22.) Finally, the ALJ found the fact Davidson performed duties while incarcerated, including cutting grass, working in the kitchen, and wiping and putting salt on tables, showed a "significant capacity to concentrate and persist in performing work tasks and following work procedures, as well as following a routine work schedule." (Tr. 22.) The ALJ also found that Davidson's ability to watch television and use the internet showed a "significant capacity to concentrate." (*Id.*)

The ALJ's interpretation of the record evidence greatly overestimates Davidson's functional capacity. He paints a picture of a claimant with "significant mental functional capacity," maintained through a "generally conservative course of treatment" (Tr. 22), concluding that the record contained no evidence of "significant mental health treatment" (Tr. 23). Review of the record in its entirety shows quite the opposite. Subsequent to Davidson's July 2017 release from prison, the records demonstrate extreme depression with suicidal ideation, despite continued medication and therapy. In October 2017, Davidson told his treating physician, Dr. Ashley Munroe, that he did not believe his Paxil medication was working, that he felt down "all the time," that he was "not afraid of dying" and had "nothing to live for," and stated that he "would get a gun from a friend and blow his brain out." (Tr. 399.) In January 2018, his treating physician noted that while Seroquel helped his mood, it

5

also caused significant weight gain. (Tr. 404.) Davidson did not believe his Effexor medication was working and his cousin, with whom he lives, stated that Davidson rarely exited his room and had no appetite. (*Id.*)

February 2018 marks the beginning of multiple trips to the hospital for emergency psychiatric care. On February 8, 2018, Davidson presented to the emergency room with worsening paranoia, visual hallucinations, and command auditory hallucinations telling him to kill himself. (Tr. 539–75.) After treating for four days with medications and therapy, Davidson's condition improved enough to be considered "clinically stable" for discharge on February 12. (Tr. 540.) On August 21, Davidson reported to nurse practitioner Rabany Clayborn that in a one-week period, he typically only has three "good" days. (Tr. 426.) He told Clayborn that he felt "tired of life" and heard a female voice telling him to harm himself. (*Id.*) Because Davidson was unsure whether he would actually harm himself, Davidson agreed to go to the psychiatric hospital for evaluation and treatment. (*Id.*) He was escorted to Aurora Psychiatric Hospital by the police (*id.*), but ultimately "did not stay long" at the hospital (Tr. 425).

On October 16, 2018, around 11:10 a.m., Davidson reported to his therapist that he experienced five to six panic attacks on a daily basis. (Tr. 517.) Davidson again was escorted to the Aurora Psychiatric Hospital for treatment (*id.*); however, he left prior to being evaluated (Tr. 448). That evening, however, Davidson was riding a city bus when the driver saw him exhibiting mildly erratic and concerning behavior. (*Id.*) The bus driver called security, who dropped Davidson off at a firehouse. (*Id.*) Davidson was eventually transported to the hospital around 10:00 p.m. for a suspected overdose. (*Id.*) The records note that Davidson presented with an altered mental state and repeated attempts at questioning resulted in

6

incomprehensible mumbling. (Tr. 456.) The next day, Davidson was lethargic and blunted, unable to participate in the evaluation. (Tr. 465.) By October 21, Davidson's condition improved. (Tr. 462–63.) He admitted that he took too much Fluoxetine and Risperidone, but denied attempting suicide, stating that his cousin normally dispenses his medications and that he was confused. (Tr. 463.) Although Davidson continued to hear voices episodically, they were now quieter and indiscernible. (Tr. 462–63.) Davidson was deemed safe for discharge. (Tr. 463.)

Davidson's overdose caused him to develop a pulmonary embolism, requiring three to six months of anticoagulation treatment. (Tr. 639.) Despite Davidson's statement at the hospital that his overdose was accidental, he told his primary care physician several days later, on both October 23 (Tr. 643) and October 26, 2018, that he was trying to kill himself intentionally and noted that his cousin locks up his medication when she is not home (Tr. 639). Davidson endorsed having visual hallucinations. (Tr. 643.) In December, Davidson reported feeling depressed or hopeless nearly every day (Tr. 668) and his cousin stated that someone is with him at all times (Tr. 667). In early 2019, Davidson continued to report daily symptoms of depression despite taking his medications (Tr. 679, 684) and continued to need constant supervision (Tr. 679).

Against the backdrop of these medical records, it is difficult to understand how the ALJ came to the conclusion that he did. Again, the ALJ found Davidson's mental health treatment "conservative." For mental health treatments, as opposed to physical health treatments, determining whether treatment is "conservative" is not as clear. Even so, Davidson's course of treatment would not fall under the term "conservative." Throughout the relevant time period, Davidson treated with both anti-depressant and anti-psychotic

7

medications. (*See* Tr. 404 and Tr. 667.) He engaged in mental health counseling at least once a month, and often up to three times per month. (Tr. 356, 355, 373 in Feb.; Tr. 354, 353, 372 in Mar.; Tr. 350, 347, 370 in Apr.; Tr. 519, 511, 510 in Jan. 2019). In addition, Davidson was admitted for in-patient psychiatric treatment for four days in February 2018 and for five days in October 2018. (Tr. 539, 440.) He also sought emergency treatment in August 2018 for suicidal ideation. (Tr. 425–26.) While the ALJ believed Davidson's lack of a "lengthy" in-patient hospitalization supports the notion of conversative mental health treatment, in-patient hospitalization, no matter the length, is not "conservative" treatment for mental health impairments.

Furthermore, the record does not support the ALJ's conclusion that Davidson's symptoms were "controlled, reduced, or eliminated" through his treatment. (Tr. 22.) While Davidson *did* show some improvement, particularly in 2019 when he several times denied reports of depression or anxiety (Tr. 519, 531, 535), these records are interspersed with multiple records showing continued auditory hallucinations and symptoms of depression (Tr. 511, 533). This is a far cry from his symptoms being controlled or eliminated.

Finally, the ALJ places far too much emphasis on Davidson's activities to discount his disabling symptoms. It is unclear how cutting grass, opening cans, wiping tables, putting salt on tables, watching television, or surfing the internet demonstrates a "significant capacity to concentrate and persist." (Tr. 23.) Especially given the record evidence showing the tremendous extent Davidson relied on his cousin, with whom he lives, to provide his care. The record shows that Davidson needed his cousin to administer his medications, that she kept his medications locked up when she was not home (Tr. 639), and that she never left him home alone (Tr. 679). Even the Administration's field office employee observed and recorded

8

that Davidson received a lot of help from his cousin. (Tr. 204.) For all of these reasons, I find the ALJ erred in his consideration of Davidson's subjective symptoms and that remand is warranted on this ground.

### 2.2 Evaluation of Variable Functioning

Davidson argues that the ALJ failed to account for his variable functioning in assessing his RFC, glossing over his periods of reduced functioning and focusing too heavily on his periods of improvement. (Pl.'s Br. at 16–17.) An ALJ cannot cherry-pick the record, citing only to records showing the claimant is doing well and ignoring the records that show he is doing poorly. This is especially true in cases of mental impairments. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). For the same reasons I find the ALJ erred in his consideration of Davidson's subjective symptoms, I agree that the ALJ focuses too heavily on Davidson's periods of improvement and improperly discounts the many records interspersed within the records of improvement showing mental impairment. Thus, remand is also warranted on this ground.

### 2.3 Weight Given to Treating Sources

Finally, Davidson argues the ALJ improperly weighed the opinions of his treating medical providers—Daniel Medlock, LPC and Robert Lee, ACSW.

Lee completed a Mental Impairment Medical Source Statement on May 9, 2019. (Tr. 694–98.) Lee opined very severe work restrictions for Davidson, including missing more than four days per month of work due to symptoms and needing four to five unscheduled breaks per day. (Tr. 695.) Either of these restrictions, in and of themselves, would be work preclusive.

(Tr. 56–57.) Lee also opined, however, that Davidson had marked limitations in his ability to understand, remember, and apply information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 696–97.) Medlock completed a Mental Impairment Medical Source Statement on October 16, 2018. (Tr. 435–39.) Medlock stated that Davidson was morbidly depressed and experienced constant auditory and visual hallucinations, panic attacks, and sleep problems. (Tr. 435.) Medlock opined similarly restrictive work limitations as Lee, finding that Davidson would miss more than four days per month of work due to symptoms and would need six or more unscheduled breaks per day. (Tr. 436.) Medlock similarly opined that Davidson had marked limitations in his ability to understand, remember, and apply information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 438–39.) The ALJ rejected both treating source statements on nearly identical grounds. (Tr. 25–26.) The ALJ concluded the opinions were inconsistent with the record evidence showing that Davidson had "the mental capacity to perform at a significant functional level," the activities he engaged in while incarcerated (i.e., drawing, painting, working), and the records showing improvement in Davidson's conditions. (*Id.*)

An ALJ must consider all medical opinions in the record regardless of its source, utilizing the following factors: the examining relationship, the treatment relationship, the opinion's supportability and consistency, the provider's specialization, and other relevant factors. 20 C.F.R. § 404.1527(c). Supportability and consistency are the most important factors to consider in determining the persuasiveness of a medical source's opinion. *Id.* § 404.1527(b)(2). Again, for the reasons I find the ALJ erred in evaluating Davidson's subjective symptoms, I find the ALJ erred in his evaluation of Lee and Medlock's opinions. As

previously stated, the ALJ's finding that Davidson had "the mental capacity to perform at a significant functional level," is flawed, as well as his reliance on the record evidence indicating improvement in Davidson's condition to the exclusion of the records showing continued serious impairment despite medication and therapy. For these reasons, I find the ALJ erred on this ground as well.

## CONCLUSION

Davidson seeks reversal and remand of this case on several alleged grounds of error. I agree the ALJ erred in his consideration of Davidson's subjective symptoms, which infects his analysis of Davidson's RFC and the weight given to his treating providers' opinions.

Davidson asks for reversal and an award of benefits, but that remedy is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports but one conclusion—that the claimant qualifies for disability benefits. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). As discussed above, there are unresolved issues the ALJ must sort out on remand. For these reasons, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of August, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge